## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————————————
DESMOND K. B.,                                    :
                                                 :
                    Petitioner,                  :          Civ. No. 20-6884 (KM)
                                                 :
         v.                                      :
                                                 :
THOMAS DECKER, *et al*.,                          :          **OPINION**
                                                 :
                    Respondents.                 :
———————————————————————  :

**KEVIN MCNULTY, U.S.D.J.**

### I.        INTRODUCTION

Petitioner, Desmond K. B.,[1] is an immigration detainee currently held at the Hudson County Correctional Facility ("HCCF") in Kearny, New Jersey. He is proceeding by way of counsel with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. (DE 1.) Respondents oppose the petition. (DE 10.) Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the petition will be granted.

### II.       BACKGROUND

#### A.        COVID-19 Pandemic

The United States is presently experiencing a pandemic caused by a novel coronavirus commonly referred to as COVID-19. *See* Ctrs. for Disease Control and Prevention, *Global COVID-19*, https://www.cdc.gov/coronavirus/2019-ncov/global-covid-19/index.html (last visited Aug. 6, 2020). In the United States to date, over millions of people have been infected and over

---

[1]      Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

150,000 people have died. *See* Ctrs. for Disease Control and Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Aug. 6, 2020). Initially, New Jersey was one of the states most impacted by the virus, seeing a sharp rise in cases throughout the months of March and April of 2020. *See* N.Y. Times, *New Jersey Coronavirus Map and Case Count*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html (last visited Aug. 6, 2020). While the virus remains, the overall trend of new cases in New Jersey has sharply fallen since May 2020. *See id.* Hospitalizations are also down more than 90% from their peak on April 14, 2020. *See* New Jersey COVID-19 Information Hub, https://covid19.nj.gov/#Live-updates (last visited Aug. 6, 2020). Unfortunately, however, there is no cure or vaccine yet for this infectious disease and it continues to present a serious public health threat. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited Aug. 6, 2020).

The COVID-19 virus spreads "mainly through close contact [within about six feet] from person-to-person in respiratory droplets" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads. html (last visited Aug. 6, 2020). In order to thwart the spread of the illness, the Centers for Disease Control and Prevention ("CDC") recommend social distancing (staying at least six feet away from others), wearing cloth face coverings when around others, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited

Aug. 6, 2020). Obviously, however, the "the best way to prevent illness is to avoid being exposed to this virus." *See id*.

Although COVID-19 can affect anyone, the CDC has identified groups of individuals who "***are*** at increased of severe illness from COVID-19," as well as those who "***might be*** at increased risk." *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Aug. 5, 2020) (emphasis added). Those who are at increased risk include individuals who are immunocompromised, have serious heart conditions, or have a body mass index ("BMI") of 30 or higher, among others. *See id.* The CDC also warns that "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *See id.* As new information becomes available about the conditions that place people at higher risk for serious illness, the CDC continues to update these categories. *See id.*

## B.    Background

### i.    *Procedural History*

Petitioner is a 39-year-old native and citizen of Sierra Leone. (DE 1-2 at 2.) He entered the United States in November 1990 and was admitted as the child of a Lawful Permanent Resident. (DE 10-8 at 5.) It appears that at some point Petitioner adjusted his status to also become a Lawful Permanent Resident. (DE 1 at 55.)

In 2002, Petitioner pleaded guilty to first degree robbery, in violation of N.Y. Penal Law § 160.15(4). (DE 10-6 at 9.) He was sentenced to five years in prison. (*Id.* at 10.) As a result of his conviction, an immigration judge ordered Petitioner removed from the United States on May 12,

2006. (DE 10-7 at 2.) Due to difficulties obtaining travel documents for Petitioner, Immigration and Customs Enforcement ("ICE") later released him on an order of supervision. (DE 10-8 at 5–6.)

In November 2011, Petitioner pleaded guilty to conspiracy to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846. (DE 10-9 at 2.) Petitioner was sentenced on November 19, 2013 to 51 months in prison and five years of supervised release. (*Id.* at 2–4.) It appears that Petitioner was released from prison on or around November 26, 2014. (DE 1 at 55; DE 10 at 18.) In September 2019, Petitioner violated the terms of his supervised release by failing to report to probation and failing to report his change of residence and was subsequently taken back into federal custody. (DE 10-10 at 2; DE 10 at 18.) For his probation violations, Petitioner was sentenced to time served plus one week. (DE 10-10 at 3.) On February 10, 2020, Petitioner entered ICE custody where he since has remained pursuant to 8 U.S.C. § 1231(a). (DE 10 at 19; DE 10 at 56.) Petitioner states that his removal to Sierra Leone is, at present, "impossible" because Sierra Leone has closed all borders in an effort to combat the spread of COVID-19. (DE 1 at 17.)

ii.     *Petitioner's Health*

Petitioner suffers from asthma, obesity, and anxiety. (DE 1 at 15.)  Petitioner's medical records from HCCF reveal a diagnosis of "mild intermittent asthma, uncomplicated" for which Petitioner receives an albuterol inhaler. (DE 2-3 at 2.) While his medical records indicate that his asthma is "well-controlled," Petitioner appears to dispute its severity, indicating that his asthma has worsened during the pandemic and that he is having "near-daily" attacks. (DE 2 at 47; DE 18 at 10.) Petitioner points to an incident on March 25, 2020, where his inhaler did not adequately treat his asthma and he required emergency care and a nebulizer. (DE 18-2 at 9.) Petitioner also

provides a declaration from Dr. Trevor Pour who reviewed Petitioner's medical records and opines that Petitioner's symptoms "are not consistent with his current diagnosis of 'mild intermittent asthma' and are more consistent with a diagnosis of persistent asthma which may require additional controlling medications to treat effectively." (DE 18-1 at 9.)

Regarding his weight, Petitioner's medical records indicate that he has BMI of 36.3. (DE 2-3 at 3.) Dr. Pour states that this BMI meets the CDC's definition of "Class 2 clinically obese." (DE 18-1 at 7.) Dr. Pour states that Petitioner's obesity heightens his risk of COVID-19's severity if he were to contract the virus. (*Id.* at 9–10.)

Finally, as to his mental health, Petitioner's medical records also confirm that he suffers from an unspecified anxiety disorder. (DE 2-3 at 2–3.) Petitioner first presented with mental health issues at HCCF, where he was seen by medical staff and prescribed anti-anxiety medication. (*See generally* DE 2.) He has continued to receive follow-up treatment for his disorder and informed that once the facility's "lock down" has ended, he should receive individual counseling. (*See generally* DE 2; DE 2-1; DE 11 at 12.) Dr. Pour suggests, however, that Petitioner's continued detention "will likely exacerbate [his] psychosis and risk long term deleterious mental health effects, which will subsequently increase his risk of COVID-19 infection and poorer prognosis if infected[.]" (DE 18-1 at 8.)

## C.    **Conditions at HCCF**

### i.    *Respondents' Evidence Regarding the Conditions at HCCF*

To delineate the measures HCCF has implemented to combat the spread of COVID-19, Respondents provide the declaration of Ron Edwards, the Director of the Hudson County

Department of Corrections and Rehabilitation. (DE 25-1.)[2] Mr. Edwards states that since March 2020, HCCF has taken various measures to ensure the health and safety of detainees during the COVID-19 outbreak. (*Id.* at 2–3.) The protocols are lengthy and detailed, and I summarize them only briefly.

As of March 7, 2020, HCCF has revised its intake procedures for new detainees and inmates in order to prevent anyone coming into the facility who might have COVID-19. (*Id.* at 4.) All facility, staff members, or vendors coming into HCCF must have their temperatures screened by a medical professional prior to entering the facility. (*Id.* at 5.) Anyone with a temperature over 100 degrees Fahrenheit is not permitted to enter. (*Id.*) Tours, volunteer services, and visitation have been suspended. (*Id.* at 5, 7.)

Staff and detainees have been advised regarding proper protocols and best practices to prevent the spread of COVID-19, including the importance of hand washing. (*Id.* at 5.) HCCF has posted CDC and Department of Health posters with this information throughout the facility. (*Id.*)

Each detainee housing unit is now on a "Restrictive Schedule" which only permits detainees outside of their cells for two three- and one-half-hour periods per day. (*Id.* at 3–4.) These recreation periods have been staggered in order to allow room for proper social distancing. (*Id.* at 7.) Detainees "do not mingle during recreation time." (*Id.*)  The recreation areas are "constantly being cleaned throughout the day." (*Id.*) The housing units are "locked down between shifts to clean and sanitize," and are sanitized no less than three times per day. (*Id.* at 4.) Inmates and detainees may also request disinfectant wipes from staff. (*Id.*)

---

[2]     Respondents have provided several updated declarations from Mr. Edwards. (DE 10-5; DE 19-1; DE 21-1; 25-1) I refer to the most recently filed declaration, as it provides the most current protocols and numbers of cases.

Detainees are provided with two bars of soap each, but additional soap is available upon request. (*Id.* at 10.) Detainees also have unlimited access to water and are provided with disinfectant wipes upon request. (*Id.*) All detainees have also been provided with surgical masks, and all staff have been provided with Personal Protective Equipment. (*Id.* at 8, 12.)  An HCCF "compliance officer" goes around the facility during the day to ensure correctional officers are wearing their masks. (*Id.* at 12.)

HCCF has established a designated housing unit as a quarantine area for detainees who are suspected of having, or who have tested positive for, COVID-19. (*Id.* at 9.) Medical personnel are visiting each cell twice a day to check on every detainees' medical and mental health. (*Id.* at 8.) Meals are provided to detainees within their cells so that they do not congregate for mealtime. (*Id.*) HCCF staff are encouraging inmates and detainees to avoid congregating in general. (*Id.*)

HCCF is following guidance issued by the CDC and World Health Organization ("WHO"), as well as local guidelines, on testing and treatment for COVID-19. (*Id.*) Detainees who exhibit symptoms consistent with COVID-19 are evaluated "immediately" and any detainee who feels symptoms can make daily sick calls as needed. (*Id.*) A detainee may "submit a medical complaint using a kiosk or submit a handwritten request to a nurse that comes in the unit twice a day." (*Id.*)

If a detainee tests positive for COVID-19, but does not require hospitalization, he will be isolated in a designated isolation area with other individuals who have tested positive. (*Id.* at 9.) Detainees who are symptomatic and awaiting test results are placed in quarantine, where they remain for 14 days. (*Id.*) Their vitals are monitored daily and they are evaluated for hospital placement. (*Id.*) Individuals who are asymptomatic but have been exposed to someone with confirmed COVID-19, are housed together in a practice referred to as "cohorting." (*Id.*) If, after 14 days, no new cases develop, cohorting is discontinued. (*Id.*) Detainees with health conditions

identified by the CDC as placing them at higher risk of developing serious illness of COVID-19 are monitored daily and there is a plan in place to remove them from the rest of the population if the HCCF Medical Department deems it necessary. (*Id.* at 6.)

As of August 3, 2020, HCCF has "no active cases of COVID-19 among the inmates, detainees or staff." (*Id.* at 10.) Since the start of the outbreak, HCCF 17 detainees tested positive for COVID-19, 27 county and federal inmates tested positive, and 103 staff members have tested positive. (*Id.*) Tragically, five HCCF staff members died from complications due to COVID-19. (*Id.*) In June, Mr. Edwards exercised his discretion as Director and undertook to test the entire facility for COVID-19. (*Id.* at 11.) Out of the 719 inmates and detainees currently at HCCF, 706 tested negative. (*Id.*) The 44 who have tested positive, as indicated above, have all made a full recovery. (*Id.*) There have been no positive test results among inmates or detainees since May 8, 2020, and no positive test results among staff since May 12, 2020. (*Id.* at 10.) As a result, the facility has "established fully tested and clean housing tiers." (*Id.* at 12.) Mr. Edwards avers that HCCF continues to have a "liberal testing policy." (*Id.* at 8.)

> ii.   *Petitioner's Evidence Regarding the Conditions at HCCF*

To describe the conditions at HCCF, Petitioner provides his own declaration dated April 9, 2020, as well as the declaration of Lauren Reiff, an immigration attorney with whom he has been in recent contact. (DE 1-1 at 16–18; DE 22-1 at 3.)[3] Petitioner describes a lack of adequate cleaning at the facility. (DE 22-1 at 4.) He states that the common area is only cleaned once a day – a fact he is able to personally observe because he can view the common space from his cell. (*Id.* at 4–5.) Communal phones are not sanitized after each person uses them and there are no cleaning

---

[3]      Ms. Reiff states that due to the coronavirus pandemic, she has been unable to meet with Petitioner in person and, therefore, cannot obtain a more recent signed declaration from him regarding the conditions at HCCF. (DE 22-1 at 3.)  Thus, her declaration contains the information Petitioner has communicated to her in support of his habeas petition. (*Id.*)

supplies in the common room to clean such frequently used items. (*Id.* at 5.) In fact, Petitioner indicates he has never been provided with disinfectant spray or wipes, not even to clean his cell. (*Id.*) He also provides that it is generally "impossible to maintain social distance." (DE 1-1 at 17.)

Petitioner submits that since April, he has been provided with a single disposable surgical mask. (*Id.*; DE 22-1 at 5.) While he always wears a mask when outside of his cell, Petitioner alleges that other detainees and guards only use the mask "improperly and sporadically." (DE 22-1 at 5.) In fact, Petitioner states that "[m]any guards do not wear masks at all," and detainees assigned to distribute food do not always their wear masks either. (*Id.* at 6.)

Petitioner further provides that he has never received any medical or mental health checks in his cell, despite Mr. Edwards' declaration. (*Id.* at 9.) He alleges difficulty accessing prompt medical attention, indicating that although he has made "at least 16" medical requests via HCCF's kiosk, most of his requests were either "completely ignored or responded to only after many days." (*Id.* at 9–10.) Petitioner has learned that some of his requests never "made it through" because the kiosk is "frequently" broken and is broken currently. (*Id.*)

### III.    JURISDICTION

At the outset, I note that Respondents challenge this Court's jurisdiction to entertain this petition. (DE 10 at 23–28.) Respondents argue that Third Circuit case law does not permit conditions of confinement claims to be raised through a § 2241 petition. (*Id.* at 25.) Futher, Respondents assert that even if this Court did have jurisdiction, release from confinement is not the proper remedy. (*Id.* at 29–30.) Petitioner, however, contends that not only are his conditions of confinement claims cognizable in a §2241 petition because the relief he seeks is only cognizable via a habeas petition. He submits that his immediate release from custody is the only way to remedy the alleged constitutional violations asserted in his case. (DE 18 at 7–9, 18–20.)

Historically, conditions of confinement claims have been brought pursuant to 42 U.S.C. § 1983, seeking damages or amelioration of those conditions by injunction. *See Camacho Lopez v. Lowe*, Civ. No. 20-563, 2020 WL 1689874, at *4–5 (M.D. Pa. Apr. 7, 2020). However, where an individual seeks "immediate or more speedy release," he or she is, or is deemed to be, asserting a remedy available through a habeas petition. *Preiser v. Rodriguez*, 411 U.S. 475, 494 (1973); *see also Camacho Lopez*, 2020 WL 1689874, at *4 ("[Petitioner] seeks immediate release from custody based on what he perceives to be constitutionally deficient conditions of confinement that threaten his health and life. This is unequivocally a habeas remedy.") A habeas petition is the process by which an individual may challenge the "fact or length" of confinement. *See Preiser*, 411 U.S. at 494. To date, the United States Supreme Court has not expressly stated whether a conditions of confinement claim may be raised through a habeas corpus petition. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017) ("[W]e have left open the question whether [individuals] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus."); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser*, 411 U.S. at 499 ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). However, federal courts of appeals appear to have permitted such challenges. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242 n.5, 242–44 (3d Cir. 2005); *Jiminian v. Nash*, 245 F.3d 144, 146–47 (2d Cir. 2001); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978); *Miller v. United States*, 564 F.2d 103, 105 (1st Cir. 1977).[4] In the absence of further guidance, recent case

---

[4]     Recently, the Third Circuit issued a decision in *German Santos v. Warden Pike Cnty. Corr. Facility*, which held that one factor in determining whether an immigration detainee's detention was unreasonably

law among district courts in this circuit have been fairly consistent in holding that an immigration

detainee may challenge the conditions of his confinement through a § 2241 petition. *See Cristian*

*R. v. Decker*, Civ. No. 19-20861, 2020 WL 2029336, at *2 (D.N.J. Apr. 28, 2020) (collecting

cases); *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 2025384, at *2 (M.D. Pa. Apr. 27, 2020)

(collecting cases). Within this emerging case law, several district courts have also granted release,

in the form of temporary restraining orders or preliminary injunctions, to immigration detainees

whose conditions of confinement were found to be unduly punitive in light of their medical

conditions. *See Carlos M. R. v. Decker*, Civ. No. 20-6016, 2020 WL 4339452, at *11 (D.N.J. July

28, 2020); *Armando C. G. v. Tsoukaris*, Civ. No. 20-5652, 2020 WL 4218429, at *10 (D.N.J. July

23, 2020); *Renat T. v. Decker*, Civ. No. 20-4658, 2020 WL 3819227, at *7 (D.N.J. July 8, 2020)*;*

*Cristian A.R. v. Decker*, Civ. No. 20-3600, 2020 WL 2092616 (D.N.J. Apr. 12, 2020); *Rafael L.O.*

*v. Tsoukaris*, Civ. No. 20-3481, 2020 WL 1808843 (D.N.J. Apr. 9, 2020); *Malam v. Adducci*, No.

20-10829, 2020 WL 1672662 (E.D. Mich. Apr. 5, 2020); *Castillo v. Barr,* Civ. No. 20-605, 2020

WL 1502864 (C.D. Cal. Mar. 27, 2020); *Basank v. Decker*, Civ. No. 20-2518, 2020 WL 1481503

(S.D.N.Y. Mar. 26, 2020); *Thakker v. Doll*, No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31,

2020) (frequently cited as the leading case).  Given these considerations, I agree with the cases

that have permitted conditions of confinement claims to proceed through a habeas petition.

Accordingly, I find that this Court has jurisdiction over this habeas action.[5]

---

prolonged under 8 U.S.C. § 1226(a) was whether the detainee's "conditions of confinement are
'meaningfully different[ ]' from criminal punishment." 965 F.3d 203, 2020 WL 3722955, at *6 (3d Cir. Jul.
7, 2020) (quoting *Chavez-Alvarez v. Warden York Cnty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015)). The
Third Circuit further stated that, "if an alien's civil detention under § 1226(c) looks penal, that tilts the
scales toward finding the detention unreasonable." *Id.* Although this case is not directly relevant to the issue
at hand, it does indicate that the Third Circuit "permits consideration of detainee's conditions of
confinement in analyzing whether habeas relief is warranted." *Carlos M. R.*, 2020 WL 4339452, at *9.

[5]     Jurisdiction is properly laid in this District Court, because Petitioner is detained within this district
and alleges that his detention violates the Constitution. With exceptions not relevant here, a petitioner may
seek § 2241 relief only in the district wherein he or she is held in custody. *Carafas v. LaVallee*, 391 U.S.

#### IV.    LEGAL STANDARD

Petitioner seeks his release from ICE custody during the pendency of his immigration proceedings. (DE 1 at 74.) I construe this as a request for a preliminary injunction. *See Hope v. Warden York Cty. Prison*, Civ. No. 20-1784, 2020 WL 1922372, at *2-4 (3d Cir. Apr. 21, 2020); *Ousman D. v. Decker*, Civ. No. 20-2292, 2020 WL 1847704, at *4 (D.N.J. Apr. 13, 2020). Such injunctive relief is an "extraordinary remedy" and "should be granted only in limited circumstances." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994) (internal quotation marks omitted). In order to obtain a preliminary injunction, the moving party must show the following:

> (1) a reasonable probability of eventual success in the litigation, and
> (2) that it will be irreparably injured . . . if relief is not granted. . . .
> [In addition,] the district court, in considering whether to grant a
> preliminary injunction, should take into account, when they are
> relevant, (3) the possibility of harm to other interested persons from
> the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (alteration in original) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The movant bears the burden of establishing "the threshold for the first two 'most critical' factors . . . If these gateway factors are met, a court then considers the remaining two factors and

---

234, 238 (1968); *see also United States v. Figueroa*, 349 F. App'x 727, 730 (3d Cir. 2009) (reviewing case law requiring filing in district of confinement); *Gutierrez v. Gonzales*, 125 F. App'x 406, 412 (3d Cir. 2005) (surveying territorial custody requirement in relation to ICE detainees who were removed). That jurisdictional/territorial requirement flows naturally from the nature of a habeas petition, which is directed to the petitioner's custodian and alleges that the custodian is holding the petitioner in violation of the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Rumsfeld v. Padilla*, 542 U.S. 426, 447 (2004) ("Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement.") (citations omitted); *Maleng v. Cook*, 490 U.S. 488, 490 (1989).

determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, the strength of a claim on the merits is in a kind of resonance with the balance of the harms: "the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)).

## V.    DISCUSSION

Petitioner asserts two causes of action arising under the Fifth Amendment: a conditions of confinement claim and an inadequate medical care claim. (DE 1 at 72–73.) He submits that these due process violations and their resulting harm warrant his immediate release from custody. (*Id.* at 74.) Based upon the evidence presented to the Court, I find that Petitioner has met the standard for a preliminary injunction.

### A.    Likelihood of Success on the Merits

#### i.    *Conditions of Confinement*

In light of his medical vulnerabilities and the present conditions at HCCF, Petitioner argues that Respondents are subjecting him to impermissibly punitive conditions of confinement. (DE 1 at 72.) He submits that Respondents' failure to adequately protect him during this contagious outbreak violates his Fifth Amendment rights. (*Id.* at 72–73.) Respondents assert, however, that Petitioner's allegations about the conditions at HCCF are squarely rebutted by Mr. Edwards' declaration, and that Petitioner's contentions about his medical conditions are refuted by his medical records. (DE 10 at 34.) Respondents maintain that HCCF has taken adequate measures to

13

minimize and contain COVID-19, and that Petitioner is not, in fact, a medically vulnerable individual. (*Id.* at 34–43.)

An immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth Amendment. *See E.D. v. Sharkey*, 928 F.3d 299, 306–07 (3d Cir. 2019) (holding that immigration detainees are entitled to the "same due process protections" as pretrial detainees). Consistent with due process, "a detainee may not be punished prior to an adjudication of guilt." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). To determine whether a challenged condition amounts to punishment, a court will consider whether it "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Conditions of confinement are "reasonably related" to a legitimate governmental objective if they serve a legitimate purpose and be rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A challenged condition may amount to impermissible punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," or if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

The COVID-19 pandemic is too recent to have produced definitive guidance from the United States Supreme Court or the United States Court of Appeals for the Third Circuit regarding conditions of confinement claims. Some principles have emerged from the case law in this district, however. In general, whether an immigration detainee's conditions of confinement amount to

punishment will depend primarily on the detainee's health and the specific conditions at the detention facility. *See Cristian R.*, 2020 WL 2029336, at *2*; Thakker*, 2020 WL 2025384, at *8; *Rafael L.O.*, 2020 WL 1808843, at *7–8. Results have varied depending on the facts of the case; "many courts have found that insufficient jail action in light of the virus can serve as a basis for release . . . while many others have found that, where the jail takes adequate precautions in light of a given petitioner's medical history, no such relief is warranted." *Cristian R.*, 2020 WL 2029336, at *2.

Judge Vazquez has contributed a useful tripartite classification of cases:

(1) detainees who do not fall into a particularly vulnerable category;

(2) detainees who fall into a particularly vulnerable category (based on age or underlying medical/physical conditions); and

(3) detainees who have tested positive for COVID-19.

*Romeo S.K. v. Tsoukaris*, Civ. No. 20-5512, 2020 WL 2537647, at *5 (D.N.J. May 18, 2020) (line breaks added). The petitions of detainees in the first category (no particular risk factors), Judge Vazquez states, have generally been denied. *Id.* Those in the second category (prisoners with risk factors) have been granted or denied depending on the circumstances—especially, whether the legitimate interests of ICE (in particular, flight risk and dangerousness) can be accommodated by available conditions of release. *Id.* For those in the third category – detainees who have the virus – the critical question becomes, in Judge Vazquez's view, not release as such, but whether the detainee is receiving prompt and adequate care. *Id.*

Here, Petitioner has multiple medical maladies. The first is his obesity. During the pendency of this petition, the CDC updated its "at risk" categories, and they now state that individuals who have a BMI of 30 or greater "are at increased risk of severe illness from COVID-19." *See See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*,

15

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Aug. 6, 2020) (emphasis added). The CDC update lowered the prior BMI threshold from 40 to 30. The update is also significant in that it distinguishes between medical conditions that *are* associated with an increased right of illness and those conditions that *might be* associated with an increased risk of illness. *See id.* Having a BMI of 30 or above places individuals in the first category of those who *are* at increased risk. *See id.* Petitioner's reported BMI of 36.3 places him well within an at-risk group. (DE 2-3 at 3.)

 Petitioner's asthma, however, does not appear to fall within a high-risk category identified by the CDC. The CDC lists "moderate to severe" asthma as a condition which might place an individual at increased risk but does not include "mild" asthma. *See See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Aug. 6, 2020). Dr. Pour states, equivocally, that Petitioner's condition is "more consistent with a diagnosis of persistent asthma which may require additional controlling medications to treat effectively," despite the fact that Petitioner's medical chart reflects that his asthma is "mild," "intermittent," and "well controlled." (DE 18-1 at 9; DE 2 at 47.) I note that Petitioner does have access to his inhaler and when he has needed additional treatment, such as a nebulizer, he has been provided with such treatment by HCCF medical staff. (DE 18-2 at 9.)

Petitioner's reported anxiety is, to be sure, a recognized psychological condition, and the Court does not discount it. It is not, however, a condition identified by the CDC as one which would cause an increased risk of harm to a person infected by COVID-19. *See* Ctrs. for Disease Control and Prevention, *People with Certain Medical Conditions*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Aug. 6, 2020).

The CDC has stated that "[t]he more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *See id.* Accordingly, I consider the Petitioner's conditions in combination, but give primary consideration to obesity, a listed high-risk factor.

I now consider the present conditions at HCCF. As of August 3, 2020, the last date for which this Court has been provided information, there is no active outbreak of COVID-19 among inmates, detainees, or staff. (DE 25-1 at 10.) Indeed, there have apparently not been any positive cases reported in almost three months. (*Id.*) While Petitioner has submitted declarations that demonstrate possible shortcomings in HCCF's protocols, the fact that HCCF has not seen any positive test results in the past few months is a very positive trend. Indeed, Respondents have presented substantial evidence that—after an inevitable catch-up period—HCCF has implemented substantial protocols to minimize and contain infection. (*See* pp. 5–7, *supra*, for more detail.) Detainees' are under a restricted schedule with staggered recreation times so they will have ample room for social distancing within common areas and will not congregate. (DE 25-1 at 7.) Detainees have been educated as to sanitary practices and provided with masks to wear whenever they leave

their cells. (*Id.* at 5, 8.) Detainees are each given at least two bars of soap to use, with more soap available upon request. (*Id.* at 10.)

Additionally, medical care complies with CDC guidelines. (*Id.* at 8.) Symptomatic individuals are evaluated immediately, evaluated for hospital placement, and monitored daily. (*Id.* at 8–9.) Detainees who may have been exposed to a confirmed case are "cohorted" for fourteen days to prevent any further spread. (*Id.* at 9.) Additionally, "compliance officers" are ensuring that correctional officers are indeed wearing the surgical masks they have been provided while working in the facility. (*Id.* at 12.)

Carceral settings present unique challenges, no perfect solution yet exists to protect individuals from contracting COVID-19. Therefore, I weigh Petitioner's medical vulnerability against that risk, the conditions at HCCF, and Respondents' interest in Petitioner's continued detention.

Respondents' legitimate governmental objective in enforcing immigration laws, preventing Petitioner from absconding, and protecting the public is well established. *See Jorge V. S. v. Green*, Civ. No. 20-3675, 2020 WL 1921936, at *4 (D.N.J. Apr. 21, 2020); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) (stating that detention can ensure a detainee does not abscond or engage in criminal activity before a final determination as to their immigration status can be made); *Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001) (identifying "ensuring the appearance of aliens at future immigration proceedings" and "protecting the community" as governmental objectives). Petitioner's detention is authorized under 8 U.S.C. § 1231(a). (DE 10 at 30–31.) However, Petitioner has long-standing ties to the United States. He has lived here for 30 years, he has a fiancé who is a United States citizen, and his three children are United States citizens. (DE 18 at 19.) He has no pending criminal charges against him. He was re-detained by

ICE for missing one check-in appointment while on supervised release for five years. (*Id.*) Thus, in weighing Petitioner's medical vulnerability, the conditions at HCCF, and the interests of the government, I find that Petitioner's present circumstances are excessive in relation to the purpose of his detention. That is especially given the alternatives available to ICE to achieve their objectives. *See Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563, at *8 (M.D. Pa. Mar. 31, 2020) ("We note that ICE has a plethora of means *other than* physical detention at their disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." (emphasis in original)). Accordingly, I find that Petitioner has demonstrated a likelihood of success on the merits of his conditions of confinement claim.

### ii.   *Inadequate Medical Care*

Petitioner also argues that Respondents have acted with deliberate indifference towards his serious medical needs by failing to adequately protect him from COVID-19 or by taking necessary and appropriate precautions to prevent high risk individuals from infection. (DE 1 at 73.) Petitioner points to the fact that Respondents have been aware of the presence of COVID-19 in their facility for months but have not released high risk detainees such as Petitioner. (DE 18 at 17–18.) He also contends that the steps Respondents have taken to thwart COVID-19 have exacerbated his anxiety disorder. (*Id.*) Respondents maintain, however, that they have undertaken significant measures to protect detainees from COVID-19 and provided Petitioner with a reasonably safe environment, as required by the Constitution. (DE 10 at 44–45.) Respondents also assert Petitioner cannot show that officials knew of and disregarded concerns to Petitioner's safety given the protocols HCCF has implemented and the medical treatment Petitioner has received. (*Id.* at 45.)

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). To succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. The Supreme Court has held that an official demonstrates deliberate indifference where "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Significantly, "[w]here a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 227 (3d Cir. 2017) (citing *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).

Here, as detailed above, HCCF has enacted significant measures to prevent the spread of COVID-19. They have undertaken efforts to permit social distancing, increase general cleaning of the facility, monitor detainees' health, and provide ongoing medical treatment, including testing, to detainees who exhibit symptoms consistent with COVID-19. (*See generally* DE 25-1.) Moreover, Petitioner's records reveal that his asthma is well controlled, he has received emergency treatment for his condition when required, and he has been prescribed medication for his anxiety. Although Petitioner states he has been unable to receive individual counseling, his medical records indicate that he will receive such therapy after the facility's lock down has ended. (DE 11 at 12.) These actions by Respondents do not demonstrate a reckless disregard for the serious threat that

COVID-19 poses or Petitioner's mental health issues. Accordingly, I find that Petitioner has not demonstrated a likelihood of success on the merits of his deliberate indifference claim.

## B.    Irreparable Harm

The second factor in determining whether an individual is entitled to a preliminary injunctive relief requires the moving party to show that he is "more likely than not to suffer irreparable harm" absent the relief requested. *Reilly*, 858 F.3d at 179. Petitioner submits that protective measures are the only way to guard against COVID-19, but such measures are "exceedingly difficult, if not impossible" in a carceral environment. (DE 1 at 71–72.) He states that, given his unique medical conditions, he is at grave risk of contagion from COVID-19 and release is the only way to provide any measure of safety against infection. (*Id.*)

There is no dispute that contracting COVID-19 would constitute a harm that meets the irreparable harm requirement.  As discussed previously, Petitioner has shown that he suffers from a medical condition which the CDC has expressly stated *does* place him at increased risk for serious illness if infected. While HCCF has made great strides in recent months towards combatting this infectious disease, carceral settings "present unique challenges for control of [COVID-19] transmission," and "[m]any opportunities exist for [COVID-19] to be introduced into a correctional or detention facility." *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Aug. 6, 2020). Thus, I find that Petitioner has demonstrated that he is more likely than not to suffer irreparable harm unless released from detention.

## C. Balancing of the Equities

Finally, I consider the remaining two factors which aim to balance the equities of the parties: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. Respondents assert that there is a significant public interest in the enforcement of the United States' immigration laws and protecting the community, especially in light of Petitioner's criminal history. (DE 10 at 47.) However, Petitioner argues that the grave risk to his health outweighs any government interest. (DE 18 at 18–20.) He contends that he is not a flight risk, that he has substantial, long-standing ties to the United States, and that he has served his time for his past offenses. (*Id.* at 19.) Petitioner submits that because reasonable conditions can adequately protect the public and ensure his appearance at any future immigration proceedings, Respondents' interest in his physical detention is severely diminished. (*Id.* at 18.)

In addition to the arguments cited by the parties, I also note the considerations around the potential spread of COVID-19. The public interest also supports Petitioner's release in order to "preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems." *Cristian A.R.*, 2020 WL 2092616, at *13. Petitioner submits that if released, he will live with his fiancé and two-year old daughter in Pennsylvania where he can practice social distancing. (DE 1 at 17.)

Taking into consideration each parties' interests and the interests of the public, I believe these concerns can be appropriately balanced by releasing Petitioner subject to strict conditions including home confinement, as well as electronic and telephonic monitoring. The specific conditions of his release are set forth in the Order accompanying this Opinion.[6] Accordingly, in balancing the equities, I find that they favor the grant of a preliminary injunction.

---

[6] Respondents' answer requests the opportunity to suggest conditions of release if the Court is inclined to grant such release. (DE 10 at 47.) Petitioner will be released on the conditions

**CONCLUSION**

For the foregoing reasons, the petition (DE 1) will be granted insofar as a preliminary injunction shall be issued. An appropriate Order accompanies this Opinion.

DATED: August 6, 2020

/s/ Kevin McNulty

_____

KEVIN MCNULTY
United States District Judge

---

outlined in the accompanying Order. If modification is sought, counsel should attempt to agree, but if there is no such consent, the Court will entertain letter applications for modification of conditions of release.